**DAEDALUS CAPITAL LLC and
LOCKWOOD TECHNOLOGY
CORPORATION,**

      **Plaintiffs,**

**v.**                                   **Case No: 8:12-cv-2533-T-35TBM**

**BRADFORD VINECOMBE, BRUNO
REIGL, ADAM VINECOMBE, ERIC
VINECOMBE, LOCKWOOD
WORLDWIDE, INC., and SWIFTSURE
GROUP LLC,**

      **Defendants.**

_____

## <u>ORDER</u>

**THIS CAUSE** comes before the Court for consideration of Defendants' Motion for Partial Summary Judgment (Dkt. 158), Plaintiffs' Response in Opposition thereto (Dkt. 161), and Defendants' Reply (Dkt. 166). Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court hereby **GRANTS in part**, and **DENIES in part**, Defendants' Motion for Summary Judgment. (Dkt. 158)

## I.    BACKGROUND

By way of their verified Amended Complaint, filed on March 1, 2013, Plaintiffs, Daedulus Capital, LLC ("Daedulus"), and Lockwood Technology Corporation ("LTC"), sue Defendants Brad Vinecombe ("Vinecombe"), former president of LTC; Bruno Riegl ("Riegl"), former employee of LTC; Adam and Eric Vinecombe, former employees of LTC and Vinecombe's sons; Lockwood Worldwide, Inc. ("LWW") n/k/a Verasset Corporation;

and Swiftsure Group, LLC ("Swiftsure")[1]. (Dkt. 92)  Plaintiffs assert, in short, that they were unlawfully targeted and defrauded of their property by Defendants through an unlawful conspiracy in violation of state and federal racketeering laws, and by acts of common law theft, conversion, fraud, breach of fiduciary duty, civil theft and conspiracy.

The remaining Counts of Plaintiffs' Complaint include:

**Count I -** violation of the Racketeering Influence & Corrupt Organization (RICO) Act, 18 U.S.C. §§ 1962(c) and 1964 (against all Defendants);

**Count II -** conspiracy to violate the RICO Act in violation of 18 U.S.C. §§ 1962(d) and 1964 (against all Defendants);

**Count III -** violation of Fla. Stat. § 772.103(3), Florida's Civil Remedies for Criminal Practices Act (the Florida RICO Act) (against all Defendants);

**Count IV -** conspiracy to violate the Florida RICO Act, under Fla. Stat. § 772.103(4) (against all Defendants);

**Count V -** fraud in the inducement (against Vinecombe and Riegl);

**Count VI -** common law fraud (against all Defendants);

**Count VII -** civil conspiracy (against all Defendants);

**Count IX -** aiding and abetting and/or conspiracy to breach a fiduciary duty (against all Defendants);

**Count X -** conversion (against Vinecombe, Adam and Eric Vinecombe, Riegl, and LWW);

**Count XI -** breach of fiduciary duty (against Vinecombe and Riegl);

**Count XII -** civil theft in violation of Fla. Stat. § 772.11 (against the Vinecombe, Adam and Eric Vinecombe, and LWW).

(Dkt. 94)  Defendants filed a Motion to Dismiss Plaintiffs' First Amended RICO Complaint on April 15, 2013, seeking to dismiss all of the above counts of the Complaint. (Dkt. 112)

---

[1] Former Defendants Cheryl S. Reed and Sovereign Bank, N.A., have since been dismissed from this suit. (Dkt. 168, 170)

United States Magistrate Judge Thomas B. McCoun III issued a Report and Recommendation, recommending that Defendants' Motion to Dismiss be denied, on August 22, 2014. (Dkt. 185) This Court confirmed and adopted Judge McCoun's Report and Recommendation, and denied Defendants' Motion to Dismiss, on September 12, 2014. (Dkt. 188)

Defendants filed their Motion for Partial Summary Judgment on December 4, 2013. (Dkt. 158) Defendants seek entry of summary judgment in their favor as to Counts I-VII, X, and XII; entry of partial summary judgment in their favor as to Daedulus' claims for damages based on damage to LTC in Counts I, VI, and VII; and entry of partial summary judgment as to Counts XI and IX. (Id.)

### a. Undisputed Facts

LTC is a New Hampshire Corporation that was created by Vinecombe in 1994. (Dkt. 158 at ¶ 2) LWW is a New Hampshire Corporation that was also created by Vinecombe in 2003. (Dkt. 158 at ¶ 3) LTC originally sold and developed asset tracking software, and provided asset tracking services, such as physical inventory services. (Dkt. 161 at ¶ 3) When Vinecombe created LWW, it was his intention to give that business to his sons, Adam, Eric, and Craig Vinecombe. (Dkt. 158 at ¶ 3-4) Vinecombe's intention was that LWW would handle physical inventory services and that LTC would continue developing and selling its asset tracking software. (Dkt. 158 at ¶ 3; Dkt. 161 at ¶ 4) LTC and LWW shared office space and would often work together on projects. (Dkt. 158 at ¶ 5)

Daedulus is a Florida Corporation, with its managing member being Ken Baritz ("Baritz"). (Dkt. 160-1 at ¶ 2) On May 8, 2009, Vinecombe sold 100% of LTC's preferred

stock, convertible into a 70% ownership interest in LTC, to Daedulus for a purchase price of $1,250,000. (Dkt. 158 at ¶ 9; Dkt. 158-12)  Of the purchase price, $250,000 was paid to Vinecombe and the remaining $1,000,000 was invested directly into LTC. (Id.) Following the transaction Vinecombe retained a 30% ownership interest in LTC, and remained President and CEO of the company. (Id.; Dkt. 160-2 at P. 30)  In conjunction with the stock purchase agreement, Vinecombe and Riegl also signed two-year employment agreements with LTC. (Dkt. 158-7 at P. 18-47)

On May 29, 2009, Vinecombe, as President of LTC, and his son Adam Vinecombe, as President of LWW, executed a "Teaming Agreement." (Dkt 158 at 7; Dkt. 158-15 at P. 55-62)  The agreement, by its terms was an "independent contractor teaming agreement," which stated: "The rights, responsibilities and obligations of the parties shall be deemed to be independent contractors; one party cannot bind the other, and the employees of one party shall not be deemed to be employees of another party." (Dkt. 161 at ¶ 5)  The "Teaming Agreement" set terms allowing one party to resell the services of the other party under their own individual contracts, or for the parties to jointly bid on project proposals. (Dkt. 161 at ¶ 8; Dkt. 158-14 at P. 1)

LTC contracted with the Connecticut State Colleges and Universities ("ConnSCU") in 2009, 2010, and 2011. (Dkt. 159 at ¶ 12-13; Dkt 158-13 at P. 12-35)  LTC also contracted with a company named "EMC" in 2008 and 2010. (Dkt. 158 at ¶ 15-16; Dkt. 158-14 at P. 5-10)  LWW performed physical inventory work involved in these projects under the LTC contracts. (Dkt. 158 at ¶ 14-16)  EMC and ConnSCU sent checks to LTC for payments on these contracts. (Dkt. 94 at P. 15-17, 21; Dkt. 158-1 at ¶ 22, 25; Dkt. 160-2 at P. 49-54, 80-81, 126) Each of these checks was made payable to LTC. (Id.)

Each of these checks was endorsed "Lockwood" and deposited directly into LWW's bank account. (Id.)

Near the end of 2010, LTC began running low on funds. (Dkt. 158 at ¶ 23)  Baritz and Vinecombe discussed their options for the company. (Dkt. 158 at ¶ 23)  Vinecombe gave Baritz several options, including, immediately shutting down LTC, firing a software engineer, or having Daedulus invest more money into LTC to give the company a chance to get by while Baritz sought out another investor. (Dkt. 158 at ¶ 23)  Baritz agreed[2] that Daedulus would invest an additional $100,000 into LTC if Vinecombe and Riegl would agree to defer half of their salaries during that time period. (Dkt. 158 at ¶ 23)

In January of 2011, an inquiry was received from Qatar University ("QU") regarding LTC's asset tracking software. (Dkt. 158 at ¶ 30; Dkt. 158-13 at P. 1)  This inquiry ultimately culminated in QU's engaging LWW in a three-phase Asset Management Project ("Project"). (Dkt. 158-15 at P. 63-71)  The Project included use and integration of LTC's asset tracking software. (Dkt. 158-1 at ¶¶ 32, 39)  LWW paid LTC $100,000 for the use of LTC's asset tracking software in the Project on December 30, 2011. (Dkt. 158-1 at ¶ 41)

Riegl resigned from LTC on April 30, 2011. (Dkt. 158 at ¶ 25)  Around the same time, Riegl and Vinecombe traveled to Qatar to begin the QU project, and were paid for their work by LWW. (Dkt. 158-13 at P. 70-71; Dkt. 160-2 at P. 69-70, 95, 97-98, 119-20)

---

[2] That is to say, the actual agreement being made between Baritz, Riegl, and Vinecombe is undisputed—whether the investment was actually necessary is disputed and whether Daedulus followed through with the full investment is disputed.

In April of 2011, Daedulus entered into a stock purchase agreement with Infrax Systems ("Infrax"). Pursuant to the agreement, Daedulus received $1,650,000 worth of stock in Infrax and warrants to purchase 660,000 additional shares of Infrax stock. (Dkt. 158-10) Vinecombe resigned as President of LTC on June 3, 2011, but agreed to continue to assist LTC as an independent contractor. (Dkt. 158 at ¶ 26-27)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by

facts.  <u>Evers v. Gen. Motors Corp.</u>, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").  If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it.  Fed. R. Civ. P. 56(e).

### III.  DISCUSSION

#### a.  Standing of Plaintiff Daedulus as to Counts I, VI, and VII

Defendants first note that Daedulus joins LTC in bringing Count I (Federal RICO Claim), Count VI (Common law fraud), and Count VII (Civil Conspiracy).  Defendants contend that these claims all concern the underlying allegations that "Defendants misappropriated LTC's corporate opportunities and software and payments allegedly due to LTC." (Dkt. 158 at P. 11)  Defendants contend that Daedulus lacks standing to bring either a direct action or a derivative action for damage caused to LTC under those Counts. Plaintiffs contend that Daedulus has standing to bring the above claims on its own behalf, due to the fact that during the time of the actions of Defendants at issue in those Counts, Daedulus suffered injury to its own business and property.

First, it appears from the Complaint that Count I is only brought by LTC, and not Daedulus.  Accordingly, Defendants' lack of standing argument as to that Count is irrelevant.  As to standing to bring a derivative suit, Defendants asserted the same argument, as to Counts VI and VII, in its Motion to Dismiss. (Dkt. 112 at P. 6-8)  As Judge McCoun concluded in his Report and Recommendation (Dkt. 185), which this Court confirmed and adopted in full (Dkt. 188), Daedulus brings suit on its own behalf in Counts VI and VII, and not on behalf of LTC. (Dkt. 185 at P. 9)

As to standing to bring a direct action, a shareholder may bring a direct action when the shareholder has "a direct, personal interest in a cause of action to bring suit even if the corporation's rights are also implicated." Franchise Tax Bd. Of California v. Alcan Aluminum Ltd., 493 U.S. 331, 336 (1990). Daedulus has a direct, personal interest in the claims under Counts VI and VII insofar as Defendants' actions may have caused it to invest additional property in LTC to its detriment. Thus, Daedulus has standing to bring the asserted claims in those Counts. However, whether Plaintiffs have met their burden on summary judgment as to the substantive claims asserted those Counts is further analyzed below.

Therefore, Defendants request for partial summary judgment on this basis as to Counts I, VI, and VII is **DENIED**.

### b. Count I- Federal RICO Claim

Count I of Plaintiffs' Complaint is a claim by LTC against all Defendants for violation of the federal civil RICO statute, 18 U.S.C. § 1962(c). Defendants contend that summary judgment should be granted in their favor because the evidence in this case does not establish each and every element of a violation of 18 U.S.C. § 1962(c).

To recover on a federal civil RICO claim, a plaintiff must prove "first, that § 1962 was violated; second, that they were injured in their business or property; and third, that the § 1962 violation caused the injury." Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1396 (11th Cir. 1994) (citations omitted). Defendants' Motion only challenges the first prong, contending that Plaintiffs cannot prove a violation of § 1962. To prove a RICO violation, Plaintiff must prove each of four elements: "(1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity." <u>Durham v. Business Management Associates</u>, 847 F.2d 1505, 1511 (11th Cir. 1988).

Defendants contend that LTC cannot prove that Defendants engaged in a "pattern of racketeering activity." To prove existence of a "pattern of racketeering activity" Plaintiff must show that: "(1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts were related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." <u>Jackson v. BellSouth Telecomms.</u>, 372 F.3d 1250, 1264 (11th Cir. 2004). Defendants contend that the evidence in this case does not support a finding that Defendants committed the five predicate acts alleged in the Complaint or that Defendants' conduct was of a continuing nature.

The predicate acts alleged in Plaintiffs' Complaint in support of the federal RICO claim include: 1) mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343; 2) money laundering in violation of 18 U.S.C. § 1957; 3) money laundering in violation of 18 U.S.C. § 1956; 4) interstate or foreign travel or transportation in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952; and 5) theft, in violation of Fla. Stat. § 812.014.

Acts that can establish a "pattern of racketeering activity" for a federal RICO claim are listed under 18 U.S.C. § 1961(1). This section defines "racketeering activity," and includes specific federal offenses and specific categories of state law offenses. <u>See</u> 18 U.S.C. § 1961(1). The categories of state law offenses include: "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical…which is chargeable under State law and punishable by imprisonment for more than one year." <u>Id.</u>

"Theft" is not expressly included as one of the state law offenses under the federal RICO statute, and courts have held that simple theft does not fall within the list of state offenses. See e.g. United States v. Napoli, 54 F.3d 63, 68 (2d Cir. 1995) ("the crime of theft, standing along, is not a specified unlawful activity"); Bonton v. Archer Chrysler Plymouth, Inc., 889 F. Supp. 995, 1002 (S.D. Tex. 1995) ("Under RICO…acts that constitute theft under state law are not predicate acts for racketeering activity."). Therefore, Defendants' alleged violations of Fla. Stat. § 812.014, cannot serve as "predicate acts" for the federal RICO claim.

As to the claims of mail and wire fraud, Defendants contend that there is no evidence supporting these claims because the acts allegedly committed by Defendants in Plaintiffs' Complaint were misrepresentations made by Defendants to third parties, and not to LTC. Claims for mail and wire fraud are nearly identical, "save for their method of execution." United States v. Bradley, 644 F.3d 1213, 1238 (11th Cir. 2011). Both offenses require a showing that a defendant: "(1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or 'causes' the use of the mails or wires for the purpose of executing the scheme or artifice." Id. The first element "requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property." Id. Defendants contend that the material misrepresentation or omission must be directed to LTC, rather than to third parties as alleged in Plaintiffs' Complaint, and that LTC must have reasonably relied on the misrepresentation.

However, the Supreme Court has held that a claim of mail fraud is sufficient when predicated on misrepresentations made to third parties and that "a plaintiff…need not

show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 661 (2008). Additionally, the Eleventh Circuit has held that proof of actual reliance is unnecessary, and mere proof of "intent to defraud" is sufficient to establish a claim of mail or wire fraud. Bradley, 644 F. 3d at 1240. "Intent to defraud" is much broader than the common law conception of fraud and reflects standards of "moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." Id. To determine whether a defendant undertook actions with the "intent to defraud," a court must consider "whether the defendant attempted to obtain, by deceptive means, something to which he was not entitled." Id. Furthermore, proof of a defendant's "intent to defraud" may be inferred by a jury from the conduct of the defendant, and "[e]vidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud." Id.

Plaintiffs' Complaint contains allegations that Defendants committed mail or wire fraud by: sending ConnSCU documents falsely showing that Eric Vinecombe was an officer of LTC and was authorized by LTC to enter into contracts on its behalf; sending an email to employees of QU falsely indicating that LWW was authorized to re-sell LTC's asset tracking software; creating and sending a license quote on behalf of LTC falsely representing that LWW, rather than LTC, identified the lead for the QU Project; and creating and sending a false license agreement for LTC's asset tracking software to QU (Dkt. 94 at P. 53-55) The ConnSCU documents have been included as part of the summary judgment record by Defendants. (Dkt. 158-13 at P. 22-23, 34-35) Additionally,

Defendants do not dispute that the license quote and agreement for LTC's software were created and sent to QU as part of the QU Project, nor do they dispute that the specific email communication sent to QU by Bruno Riegl, and containing representations that LWW was authorized to re-sell LTC's software, occurred. (Dkt. 94 at 25; Dkt. 158-1 at ¶ 32)  In fact, Defendants admit that Vinecombe and Riegl engaged in various rounds of communication with QU employees which ultimately led to LWW receiving the QU Project, and that the Project included a license of LTC's software. (Dkt. 158-1 at ¶ 27-37)

Any of these acts could constitute acts of mail or wire fraud if it is found that Defendants undertook them with an "intent to defraud," that is, if they "attempted to obtain, by deceptive means, something to which [they were] not entitled." Bradley, 644 F. 3d at 1240.  The question of intent must be inferred from the factual circumstances surrounding Defendants' conduct.  Further, there is no dispute as to the fact that Defendants profited from both the ConnSCU contracts and payments, and the QU Project.  This is a fact upon which a jury, along with inferences properly drawn from the surrounding factual circumstances and from weighing the credibility of Defendants' testimony regarding such circumstances, could reasonably find that Defendants committed such acts with an "intent to defraud" LTC.

Next, Defendants contend that the evidence in this case does not support that Defendants committed the offense of money laundering.  To establish an act of money laundering under 18 U.S.C. 1956(a)(1)(A)(i), a plaintiff must show that a defendant:

> (1) engaged in a financial transaction, (2) which he knew involved funds that were the proceeds of some form of unlawful activity, (3) where the funds involved in the financial transaction in fact were the proceeds of a specified unlawful activity, and (4) that the defendant engaged in the financial transaction with the intent to promote the carrying on of the specified unlawful activity.

United States v. Molina, 413 F. App'x 210, 212 (11th Cir. 2011). To establish an act of money laundering under 18 U.S.C. 1956(a)(1)(B)(i), a plaintiff must prove the same first three elements, but on the fourth element, a plaintiff must show that: "the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity." Id. The term "specified unlawful activity" includes any offense listed under 18 U.S.C. 1961(1), "except an act which is indictable under subchapter II of chapter 53 of title 31." 18 U.S.C. § 1956(c)(7).

In order to prove an act of money laundering under 18 U.S.C. § 1957, a plaintiff must show: (1) that the defendant knowingly engaged in a monetary transaction, (2) that the defendant knew the property involved derived from specified unlawful activity, and (3) that the property was of a value greater than $10,000." United States v. Johnson, 450 F.3d 366, 375 (8th Cir. 2006). The term "specified unlawful activity" is defined as having the same meaning given to that term under § 1956. 18 U.S.C. § 1957(f)(3).

Defendants contend that the evidence does not support a finding that they committed an act of money laundering under either § 1956 or § 1957 because the funds that serve as a basis for LTC's claims were not derived from any "specified criminal activity." Plaintiffs' Complaint alleges that the financial transactions constituting the basis for the money laundering claims are: the depositing of multiple checks received from ConnSCU and payable to LTC into LWW's bank account; multiple wire transfers by Daedulus to LTC in early 2011 based on Vinecombe's agreement with Daedulus that it would invest additional funds into LTC; and the issuing of multiple checks to Vinecombe and Riegl by LWW for payment for their work on the QU Project. (Dkt. 94 at P. 56-58)

As to the wire transfers from Daedulus to LTC, there are no facts in the record indicating that those funds were derived from "specified unlawful activity" as defined under the federal RICO statute. As to the deposits of the ConnSCU checks and the issuing of checks to Vinecombe and Riegl by LWW for their work on the QU Project, these could be financial transactions involving funds which were proceeds from "specified unlawful activity." As noted above, "specified criminal activity" includes those offenses listed under § 1961(1), which defines offenses that may constitute "racketeering activity" under the federal RICO Act. Thus, Defendants' alleged acts of mail or wire fraud could constitute "specified unlawful activity" for the purpose of the money laundering claims. To the extent that a jury could find that Defendants engaged in acts of mail or wire fraud, and that those acts led to the ConnSCU and QU contracts, it could also find that the financial transactions involving the proceeds derived from those contracts were financial transactions involving proceeds derived from "specified unlawful activity."

Defendants also contend that the evidence in this case does not establish a finding that Defendants engaged in interstate or foreign travel in aid of a racketeering enterprise. In order to prove a violation of 18 U.S.C. § 1952, a plaintiff must show that a defendant:

> [T]ravels in interstate or foreign commerce or uses the mail or any other facility in interstate or foreign commerce, with the intent to:
>
> (1) distribute the proceeds of any unlawful activity; or
>
> (2) commit any crime of violence to further any unlawful activity; or
>
> (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity.

18 U.S.C. § 1952(a). A plaintiff must also show that the defendant thereafter either performed or attempted to perform any of the acts under subsection (1), (2), or (3). Id.

The only "unlawful activity" pertinent to this case, as defined under the statute, is "any act which is indictable under…18 U.S.C. § 1956 or…§ 1957," which are the money laundering statutes Id. at (b)(i). It is undisputed in this case that Vinecombe and Riegl traveled to Qatar to perform consulting services on behalf of LWW in conjunction with the QU Project, and that LWW paid them for their work and reimbursed them for their travel expenses. (Dkt. 158-13 at P. 70-71; Dkt. 160-2 at P. 69-70, 95, 97-98, 119-20) LTC contends that these facts sufficiently establish a violation of 18 U.S.C. § 1952.

Under this section, the only actions qualifying as the "unlawful activity" would be Defendants' alleged acts of money laundering. Based on the facts proffered in this case, a jury could find that Defendants' actions in interstate or foreign travel facilitated Defendants' alleged acts of money laundering, specifically, LWW issuing checks to Vinecombe and Riegl paying them for their "consulting work" and reimbursing them for their travel expenses out of the payments received as a result of the QU Project. If not for Vinecombe and Riegl traveling to Qatar and performing consulting work on behalf of LWW for the QU Project, LWW would not have received the funds that are the subject of one of the money laundering claims.

Thus, based on the facts in this case, a jury could find that Defendants committed multiple predicate acts of: 1) mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343; 2) money laundering in violation of 18 U.S.C. §§ 1956 and 1957; and 3) interstate or foreign travel or transportation in aid of racketeering enterprises, in violation of 18 U.S.C. § 1952.

Even if there are multiple predicate acts establishing a "pattern of racketeering activity," Defendants further contend that the evidence does not establish that the "pattern

of racketeering activity" is of a "continuing nature." The Eleventh Circuit has held that "a 'pattern of racketeering' activity requires proof of something beyond the two predicate acts themselves. That something is the threat of *continuing* racketeering activity." Jackson, 372 F.3d at 1265 (citations omitted). There are two types of continuity that may establish a federal RICO claim: closed-end continuity and open-ended continuity. Id.

Close-ended continuity is established by "proving a series of related predicates extending over a substantial period of time." Id. The relevant period for determining continuity is the time during which the specifics charged acts occurred. Coquina Investments v. TD Bank, N.A., 760 F.3d 1300 (11th Cir. 2014). The Eleventh Circuit has held that closed-end continuity cannot be established upon a showing of schemes lasting less than a year; moreover, "where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time." Jackson, 372 F.3d at 1267.

Just by way of example, in Ferrell v. Durbin, 311 F. App'x 253, 256 (11th Cir. 2009)[3], the court found that a series of misrepresentations between the former owners of a hotel and resort which took place over approximately a year and a half were insufficient to establish close-ended continuity when there existed only a single scheme and two victims. Id. The court noted that its conclusion was amply supported by authority from other Circuits. See id. at 256 n.6 (citing Efron v. Embassy Suites, 223 F.3d 12, 13-14 (1st

---

[3] "Although an unpublished opinion is not binding on this court, it is persuasive authority. See 11th Cir. R. 36-2." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

Cir. 2001) (seventeen predicate acts occurring over a period of twenty-one months did not establish "closed continuity" where scheme was finite and had only one victim); Al-Abood v.. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000) (three different schemes carried out over a period of several years to defraud a single plaintiff of substantial sums of money did not establish "closed continuity" given the narrow goal)); see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n, 48 F.3d 1260, 1265 (D.C.Cir.1995) (predicate acts occurring over three year period were insufficient to allege pattern of racketeering when complaint alleged a single scheme with a single goal).

Likewise, in this case, the predicate acts took place over a course of three years. The first alleged act of wire or mail fraud, the sending of false documents connected with the first ConnScu contract, occurred on March 19, 2009. (Dkt. 158-13 at P. 22-23)  The last act, the alleged issuance of a check by LWW to Riegl or Vinecombe for their work and travel for the QU Project, occurred on March 19, 2012. (Dkt. 94 at P. 34)  There exists only a singular "scheme" connecting the predicate acts, which is Defendants' scheme to divert business proceeds from LTC to LWW and themselves, even though it may have been carried out through contracts with two different entities, ConnSCU and QU. There is only one victim in this case, LTC.  Accordingly, close-ended continuity is not present in this case.  See Ferrell, 311 F. App'x at 256 n.6.

"Open-ended continuity can be established by showing that the [predicate acts] were part of the 'regular way of doing business' or threaten repetition in the future." Id. at 257.  However, "single schemes with a specific objective and a natural ending point can almost never present a threat of continuing racketeering activity." Id.  Defendants contend that "open-ended continuity" does not exist in this case because there is no threat of

continuing criminal activity. LTC simply contend, without explanation, that it has made an adequate showing of continuity in this case. Based on the allegations in this case, Defendants only had the means and ability to carry out their alleged scheme based on the close operating relationship of LTC and LWW.  There is no threat that Defendants' alleged pattern of racketeering activity will continue into the future because their goal has been realized in the acquiring of the QU Project, and there is no longer a working relationship between the two companies giving rise to the opportunity for Defendants' pattern of predicate acts to persist into the future.  Although the two companies may continue to compete against one another, the possibility of future competition, in and of itself, does not establish a threat of ongoing criminal activity.  Accordingly, open-ended continuity is not present in this case.

Therefore, because "continuity" is an essential element of proving a federal civil RICO claim, Defendants' Motion for Summary Judgment is **GRANTED**, as to Count I.

### c.  Count II- Federal RICO Conspiracy

Count II of Plaintiffs' Complaint is a claim by LTC against all Defendants for conspiring to violate the federal civil RICO statute, under 18 U.S.C. § 1962(d).  That section states: "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).  Defendants contend that because the RICO conspiracy claim is based on the same allegations and evidence as the civil RICO claim, the RICO conspiracy claim must also fail.

In response, LTC merely provides the required elements of proof for a federal RICO conspiracy claim:

To establish a RICO conspiracy violation under 18 U.S.C. § 1962(d), the government must prove that the defendants 'objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes.' The focus is on the agreement to participate in the enterprise through the pattern of racketeering activity, not on the agreement to commit the individual predicate acts. "A RICO conspiracy differs from an ordinary conspiracy in two respects: it need not embrace an overt act, and it is broader and may encompass a greater variety of conduct.

United States v. Starrett, 55 F.3d 1525, 1543 (11th Cir. 1995) (citations omitted). LTC then summarily concludes that "[a]s shown above, [LTC] meet[s] this test." (Dkt. 161 at P. 20) However, LTC has not established a factual basis for a substantive civil RICO violation against Defendants; and therefore, its claim for conspiracy to commit a federal RICO violation must also fail. Jackson, 372 F.3d at 1269 (noting that a conspiracy claim must fail where the allegation is that defendants conspired to "commit conduct which in itself does not constitute a RICO violation").

Accordingly, Defendants' Motion for Summary Judgment is **GRANTED**, as to Count II, the federal RICO conspiracy claim.

### d. Count III- Florida RICO Claim

Count III of Plaintiffs' Complaint is a claim by LTC against all Defendants for violation of Florida's civil RICO statute, Fla. Stat. § 772.103(3). The statute states: "[i]t is unlawful for any person . . . [e]mployed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt." Fla. Stat. § 772.103(3). "Criminal activity" is defined under the Florida statute to include all of the offenses included under the definition of "racketeering activity" under the federal RICO statute, as well as additional specific offenses chargeable under Florida law. See Fla. Stat. § 772.102(1). Unlike under the

federal RICO statute, simple theft can serve as a "predicate act" establishing a "pattern of criminal activity" under the Florida RICO statute. Id. at (a).

Because the Florida RICO statute is patterned after the federal RICO statute, Florida courts look to federal RICO decisions for guidance. Jackson, 372 F.3d at 1263-64. Just as under the federal RICO statute, a plaintiff asserting a Florida RICO claim must show that: "(1) defendants committed two or more predicate acts within ten-year time span, (2) predicate acts were related to one another, and (3) predicate acts demonstrated criminal conduct of continuing nature." Id. at 1264. Likewise, establishing a "pattern of racketeering activity" under the Florida RICO statute also requires a showing of "continuity." Horace-Manassee v. Wells Fargo Bank, N.A., 521 F. App'x 782, 783 (11th Cir. 2013). The Eleventh Circuit has applied the same tests for "open-ended" and "close-ended" continuity when evaluating RICO claims under both federal and state law. See Ferrell, 311 F. App'x at 256-58; Jackson, 372 F.3d at 1263-69. Although there are potentially additional predicate acts under the Florida RICO claim because of the inclusion of the alleged violations of simple theft under Florida law, these additional predicate acts add little to the continuity analysis because those predicate acts occurred within the same time period as the federal offenses and were directed to the same alleged victim. (Dkt. 94 at P. 15-17, 21) Because LTC relies on its arguments made in regards to the federal RICO claim under Count I, as to the state RICO claim (Dkt. 161 at P. 20), its state RICO claim fails as well.

Therefore, for the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED**, as to Count III, the Florida RICO claim.

### e. Count IV- Florida RICO Conspiracy

Count IV of Plaintiffs' Complaint is a claim by LTC against all Defendants for conspiring to violate Florida's civil RICO statute, under Fla. Stat. § 772.103(4). Under this section it is unlawful for any person "[t]o conspire or endeavor to violate" any provision of the Florida RICO statute. Fla. Stat. § 772.103(4). Both the federal and state RICO conspiracy statutes require a showing of an "agreement to violate a substantive provision of the RICO statute." Jackson, 372 F.3d at 1269. Because LTC relies on its arguments made in regards to the federal RICO conspiracy claim under Count III, as to the state RICO conspiracy claim (Dkt. 161 at P. 20), and because LTC's state RICO claim fails under Count III, its state law RICO conspiracy claim must also fail.

Therefore, for the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED**, as to Count IV, the Florida RICO conspiracy claim.

### f. Count V- Fraud in the Inducement

Count V of Plaintiffs' Complaint is a claim by Daedulus against Vinecombe and Riegl for fraud in the inducement. Defendants first contend that to the extent that this claim is based on the allegation that Vinecombe and Riegl breached their employment agreements with LTC, the appropriate claim is for breach of contract rather than for fraud. However, Defendants raised the same argument in their Motion to Dismiss. (Dkt. 112 at P. 13) Judge McCoun's Report and Recommendations, (Dkt. 185), which this Court confirmed and adopted in full (Dkt. 188), addressed this issue and found that Daedulus could properly bring a tort claim independent of any breach of contract claim. (Dkt. 185 at P. 13)

Under Florida law, the elements of fraud in the inducement include: "1) a false statement concerning a material fact, 2) knowledge by the person making the statement

that the representation is false, 3) intent by the person making the statement that the representation will induce another to act upon it, and 4) reliance on the representation to the injury of the other party." <u>Mettler, Inc. v. Ellen Tracy, Inc.</u>, 648 So. 2d 253, 255 (Fla. 2d DCA 1994). Defendants contend that the evidence in this case does not support a claim of fraud in the inducement against either Vinecombe or Riegl. Daedulus responds to Defendants' arguments under this Count by asserting that LTC's initial contract with ConnSCU, the "Teaming Agreement," and the diversion of the QU Project establish that Defendants "conspired" to defraud Daedulus. (Dkt. 161 at P. 20) These bald assertions of facts, without more, do not establish the elements of fraud in the inducement. Daedulus has failed to discharge its burden on summary judgment to this Count by arguing conspiracy to defraud, rather than fraud in the inducement.

Therefore, for the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED**, as to Count V, fraud in the inducement.

### g. Count VI- Common Law Fraud

Count VI of Plaintiffs' Complaint is a claim by both LTC and Daedulus against all Defendants for common law fraud. Defendants raise the same argument regarding the appropriateness of a "breach of contract" claim over a tort claim and essentially the same arguments as to the lack of evidence establishing the elements of the claim, as raised under Count V above. The elements of common law fraud are similar to those of fraud in the inducement under Florida law. The elements include: "(1) a false statement of fact; (2) known by the person making the statement to be false at the time it was made; (3) made for the purpose of inducing another to act in reliance thereon; (4) action by the other person in reliance on the correctness of the statement; and (5) resulting damage to the

other person." <u>Gandy v. Trans World Computer Tech. Group</u>, 787 So. 2d 116, 118 (Fla. 2d DCA 2001).

Here, Plaintiffs again advance no specific facts on the record that would establish a claim of common law fraud. Instead, Plaintiffs only argue that Defendants' contention that there is no evidence that Daedulus suffered any damage as a result of Defendants' allegedly fraudulent conduct is speculative. However, Plaintiffs also offer no evidence to rebut Defendants' contention or to establish the true value of, or *any* value of, Daedulus's interest in either LTC or Infrax.

For this reason, Plaintiffs have failed to discharge their burden on summary judgment as to this Count, and Defendants' Motion for Summary Judgment is **GRANTED**, as to Count VI, common law fraud.

### h. Count VII- Civil Conspiracy

Count VII of Plaintiffs' Complaint is a claim by both LTC and Daedulus against all Defendants for civil conspiracy. The elements for a civil conspiracy under Florida law include: "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." <u>Charles v. Florida Foreclosure Placement Ctr., LLC</u>, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008). An action for civil conspiracy only exists to the extent that "the basis for the conspiracy is an independent wrong or tort which would constitute a cause of action if the wrong were done by one person." <u>Blatt v. Green, Rose, Kahn & Piotrkowski</u>, 456 So. 2d 949, 951 (Fla. 3d DCA 1984).

Defendants contend the independent "unlawful acts" that serve as the basis for

Plaintiffs' civil conspiracy claim are the same claims asserted under Count IX, for aiding and abetting a breach of fiduciary duty, and under Count XI, for breach of fiduciary duty. Defendants contend that to the extent that they are entitled to summary judgment under those counts, they are entitled to the same under this Count.

Thus, Defendants have challenged Plaintiffs' ability to prove the independent "unlawful act" element of their civil conspiracy claim. Plaintiffs respond by stating simply that Defendants "are embarked on…a shell game," seemingly asserting that Defendants have identified the incorrect "underlying wrong." (Dkt. 161 at P. 23) However, Plaintiffs do not identify the correct independent "unlawful act" serving as a basis for their claim or designate any specific facts on the record that would establish an underlying "unlawful act" committed by Defendants through their conspiracy.

For this reason, Plaintiffs have failed to meet their burden on summary judgment and accordingly, Defendants' Motion for Summary Judgment is **GRANTED**, as to Count VII, civil conspiracy.

### i. Count IX- Aiding and Abetting Breach of Fiduciary Duty

Count IX of Plaintiffs' Complaint is a claim by LTC against all Defendants for aiding and abetting a breach of fiduciary duty. LTC has alleged that Defendants aided and abetted the breaches of fiduciary duty committed by Defendants Vinecombe and Riegl, as alleged under Count XI. Under Florida law, a claim for aiding and abetting a breach of fiduciary duty requires: "(1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Grp. Ltd., 05-

60080CIV, 2008 WL 926509 (S.D. Fla. Mar. 31, 2008). Because there must first exist a fiduciary duty on the part of the primary wrongdoer in order to find that another aided and abetted the breach of that duty, Defendants are entitled to partial summary judgment in their favor to the limited extent that summary judgment is granted in favor of Riegl and Vinecombe below in Count XI, because an officer only owes fiduciary duties to a corporation as long as that individual remains an officer, and because there is no evidence that Riegl was involved in any way with the ConnSCU contracts.

Accordingly, Defendants' request for partial summary judgment is **GRANTED**, as to Count IX, aiding and abetting breach of fiduciary duty, as to any claims that Defendants aided and abetted a breach of fiduciary a duty attributable to Riegl or Vinecombe after their respective dates of resignation from LTC, and as to any claims that Defendants aided and abetted Riegl's breach of duty relating to the ConnSCU contracts.

### j. Count X- Conversion

Count X of Plaintiffs' Complaint is a claim by LTC against all Defendants except Swiftsure for conversion. Conversion is generally defined as: "an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." United Technologies Corp. v. Mazer, 556 F.3d 1260, 1270 (11th Cir. 2009); see also Estate of Villanueva ex rel. Villanueva v. Youngblood, 927 So. 2d 955 (Fla. 2d DCA 2006). The elements of a claim for conversion of money under Florida law include: "(1) specific and identifiable money; (2) possession or an immediate right to possess that money; (3) an unauthorized act which deprives plaintiff of that money; and (4) a demand for return of the money and a refusal to do so." United States v. Bailey, 288 F. Supp. 2d 1261, 1264 (M.D. Fla. 2003) aff'd, 419 F.3d 1208 (11th Cir. 2005). Defendants cite a list of cases to

seemingly assert that the evidence in this case does not show that Defendants converted "specific and identifiable money." However, Defendants' reliance on these cases is misplaced. The cases cited by Defendants merely stand for the proposition that a conversion action is not the proper vehicle to enforce a general obligation of one party to pay money to the other, or to recover that obligation out of the obligor's general funds. See e.g. Capital Bank v. G & J Investments Corp., 468 So. 2d 534, 535 (Fla. 3d DCA 1985); Belford Trucking Co. v. Zagar, 243 So. 2d 646, 649-50 (Fla. 4th DCA 1970). In this case, LTC is not seeking to enforce a general obligation owed to it by LWW, and the "money" or "property" alleged to have been converted is in the form of checks payable to LTC for payment on LTC contracts. Therefore, the property alleged to have been converted is fully capable of identification, and a claim for conversion is properly maintained.

Although unclear, it seems that Defendants also assert that an action for conversion cannot be maintained because LTC simply "contends that it should have received" the checks that LWW deposited into its account. (Dkt. 158 at P. 37) However, as LTC correctly asserts, an action for conversion can be maintained even where defendants claim that they are entitled to the property in question. Seymour v. Adams, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994) ("The tort may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action.").

For these reasons, Defendants' Motion for Summary Judgment is **DENIED**, as to Count X, conversion.

### k. Count XI- Breach of Fiduciary Duty

Count XI of Plaintiffs' Complaint is a claim by LTC against Vinecombe and Riegl for breach of fiduciary duty. Under New Hampshire law[4], "a corporate officer owes fiduciary duties to the corporation he or she serves." Hansen v. Sentry Ins. Co., 756 F.3d 53, 63 (1st Cir. 2014). First, Defendants contend that Riegl was not an officer of LTC, but merely an employee, and therefore, he did not owe any fiduciary duties to LTC. Second, Defendants contend that officers and directors of corporations do not continue to owe fiduciary duties to a corporation once they cease to be officers or directors of that corporation. Third, Defendants contend that even if Riegl did owe fiduciary duties to LTC, that he is entitled to partial summary judgment as to Plaintiffs' allegations against him in relation to the ConnSCU contracts because there is no evidence that he was involved in or had any knowledge of LWW depositing checks from ConnSCU into its account. Therefore, Defendants contend that they are entitled to partial summary judgment, in regards to any alleged breach of fiduciary duty attributable to them after they each respectively resigned from LTC, and that Riegl is entitled to partial summary judgment at least in regards to any actions related to the ConnSCU contracts and checks.

LTC only disputes Defendants' first contention, regarding whether Riegl was an officer of LTC. Defendants contend that Riegl was not an officer, but merely an employee of LTC in charge of sales. LTC points to Riegl's employment contract with LTC, which was entered into at the time that Daedulus purchased stock in LTC, to show that Riegl

---

[4] Federal courts acting pursuant to diversity or supplemental jurisdiction apply the forum state's choice of law rules. Boardman Petroleum, Inc. v. Federated Mut. Ins. Co., 135 F.3d 750, 752 (11th Cir.1998). The fiduciary duties owed to a corporation by its officers and directors concern the internal affairs of the corporation. Mukamal v. Bakes, 378 F. App'x 890, 896 (11th Cir. 2010). The Florida Corporation Act provides that the internal affairs of a corporation are governed by the laws of the state of incorporation. Fla. Stat. § 607.1505(3). Therefore, because LTC is a New Hampshire corporation, the law of New Hampshire applies to the breach of fiduciary duty claim.

was an officer of LTC. (Dkt. 158-7 at P. 33-47) LTC contends that Riegl's title in the employment agreement of "Vice President, of Sales, Marketing and Strategic Business Development" indicates that he was an officer of LTC. (Dkt. 158-7 at P. 40) New Hampshire law states: "A corporation has the officers described in its bylaws or appointed by the board of directors in accordance with the bylaws." N.H. Rev. Stat. Ann. § 293-A:8.40. Based on the record evidence, a material issue of fact exists as to whether Defendant Riegl was an officer of LTC.

However, Defendants are entitled to summary judgment to the limited extent that they did not owe any fiduciary duties to LTC beyond their respective dates of resignation from the company. Additionally, Defendant Riegl is entitled to summary judgment to the limited extent that any breach of fiduciary duty is asserted against him in relation to the ConnSCU contracts and checks. The record contains no evidence that he was involved in any way with the ConnSCU contracts or the deposit of the checks on those contract.

Accordingly, Defendants' request for partial summary judgment is **GRANTED**, as to Count XI, breach of fiduciary duty, as to any claims against Riegl for breach of a fiduciary duty attributable to the ConnSCU contracts and checks, and as to any claims for breach of fiduciary a duty attributable to Riegl or Vinecombe after their respective dates of resignation from LTC.

## I. Count XII- Civil Theft

Count XII of Plaintiffs' Complaint is a claim by LTC against Vinecombe, Adam and Eric Vinecombe, and LWW for civil theft under Fla. Stat. § 772.11. In an action for civil theft, a plaintiff is required to prove the elements of criminal theft under Fla. Stat. § 812.014(1). That section states:

A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

> (a) Deprive the other person of a right to the property or a benefit from the property.

> (b) Appropriate the property to his or her own use or to the use of any person not entitled to the use of the property.

Fla. Stat. § 812.014(1). The facts underlying this claim are not substantially in dispute. Defendants acknowledge that they took checks from ConnSCU and EMC which were made payable to LTC for payment on LTC contracts, endorsed them "Lockwood," and deposited them into LWW's bank account. (Dkt. 158-1 at ¶ 22, 25; Dkt. 160-2 at P. 49-54, 80-81, 126) LTC contends that these facts are sufficient to support a claim of civil theft. Defendants argue that there is no evidence that Defendants had the requisite criminal intent to steal property from LTC, as required under the statute. The level of intent required for civil theft is "intent to do a wrongful act, and not mere negligence or recklessness." In re Davis, 115 B.R. 346, 351 (Bankr. N.D. Fla. 1990). Intent, being a state of mind, is often not shown directly but instead is inferred from the surrounding factual circumstances. Edwards v. State, 213 So. 2d 274, 274 (Fla. 3d DCA 1968), cert. denied, 221 So. 2d 726 (Fla. 1968); Luscomb v. State, 660 So. 2d 1099, 1104 (Fla. 5th DCA 1995).

Defendants contend that they did not have an intent to deprive LTC of its property because the money received by LTC on those checks was actually money owed to LWW for work that it performed under the LTC contracts. In their testimony regarding the deposit of LTC checks into LWW's account, Defendants point to the working relationship between LTC and LWW on those contracts, as purportedly memorialized in the "Teaming

Agreement," and to Vinecombe's authority as President of LTC, to justify their actions. (Dkt. 160-2 at P. 49-54, 80-81, 126)  LTC points to the actual terms of the "Teaming Agreement" in its Response, which give rise to a dispute regarding the extent of the working relationship between LTC and LWW at the time of Defendants' actions.  The "Teaming Agreement" by its terms did not authorize Defendants' actions. (Dkt. 158 at 7; Dkt. 158-15 at P. 55-62)  In fact, the "Teaming Agreement" stated that one party could not bind the other. (Dkt. 161 at ¶ 5)  The extent of LTC and LWW's relationship contained in the "Teaming Agreement," and Defendants' reliance on it and Vinecombe's "authority" as President of LTC to support their actions, are surrounding factual circumstances bearing upon whether Defendants had an intent to deprive LTC of its property when they deposited LTC checks into LWW's account.  The question of Defendants' intent, properly determined by drawing inferences from the surrounding factual circumstances and by weighing the credibility of Defendants' testimony regarding their actions, is a factual question which must be decided by a jury in this case.

Additionally, Defendants contend that there is no evidence that LTC suffered any damage as a result of Defendants' alleged civil theft because the money due on the checks was for work that LWW performed under the LTC contracts.  "[D]amages in the context of civil theft normally correspond to the value of the property stolen by the defendant." Anthony Distributors, Inc. v. Miller Brewing Co., 941 F. Supp. 1567, 1576-77 (M.D. Fla. 1996).  The value of the checks is not in dispute in this case.  As stated above, LTC has pointed to evidence, the actual terms of the "Teaming Agreement," tending to dispute the contention that LWW was either authorized to those funds or authorized to immediately deposit the checks into its own account.  Even if Defendants' contention

regarding its entitlement to the money due on the checks is true, there is still some value attributable to LTC being able to pass those funds through its own account first. Additionally, Fla. Stat. § 772.11 allows for LTC to recover damages in the minimum amount of $200 if it can prove that it has been "injured in any fashion" by a violation of Fla. Stat. § 812.014(1).

Therefore, based on the discussion above, Defendants' Motion for Summary Judgment is **DENIED**, as to Count XII, civil theft.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that:

1. Defendants' Motion for Summary Judgment (Dkt. 158) is **GRANTED in part**, and **DENIED in part**:

   a. Defendant's request for summary judgment is **GRANTED** as to Counts I-VII;

   b. Defendant's request for partial summary judgment is **GRANTED** as to Counts IX and XI, to the extent noted above; and

   c. Defendant's request for summary judgment is **DENIED** as to Counts X and XII.

**DONE** and **ORDERED** in Tampa, Florida, this 29th day of September, 2014.

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person